

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00037-CR

MACK CURTIS IVORY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th District Court
Camp County, Texas
Trial Court No. CF20-02023

Before Stevens, C.J., van Cleef and Morriss,* JJ.
Memorandum Opinion by Chief Justice Stevens

*Josh R. Morriss, III, Chief Justice, Retired, Sitting by Assignment

## MEMORANDUM OPINION

After a Bowie County jury found Mack Curtis Ivory guilty of intoxication manslaughter, he was sentenced to ten years' confinement in prison. *See* TEX. PENAL CODE ANN. § 49.08. Ivory appeals, asserting that (1) the trial court erred when it denied his motion to suppress the blood draw evidence, (2) the evidence was legally insufficient to support the jury's verdict of guilt, (3) the trial court erred when it assessed a $100.00 "EMS fee" that was not authorized by statute, (4) the trial court erred when it assessed peace officer service fees for summoning witnesses, (5) the trial court erred when it assessed the fees for  Ivory's court-appointed attorney, and (6) the trial court erred when it assessed a time payment fee.

For the reasons below, we affirm the trial court's judgment of conviction, but we modify the clerk's bill of costs by deleting the $100.00 EMS fee, the $400.00 in attorney fees, and the $15.00 time payment fee and by amending the assessed $195.00 in officer service fees to reflect fees in the amount of $85.00.

## I. The Trial Court Did Not Err When It Denied Ivory's Motion to Suppress the Blood-Draw Evidence

In his first point of error, Ivory contends that the trial court erred by denying his motion to suppress blood evidence.  "Under both the Texas and the United States constitutions, a search warrant for the extraction of blood from a person who the police believe to have committed an intoxication offense must be based on probable cause that evidence of that offense will be found through the execution of a blood-draw search warrant." *Hyland v. State*, 574 S.W.3d 904, 910 (Tex. Crim. App. 2019) (citing U.S. CONST. amend. IV; TEX. CONST. art. I, § 9).

2

"Probable cause to search exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a [person] of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found." *Estrada v. State*, 154 S.W.3d 604, 609 (Tex. Crim. App. 2005) (quoting *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991), *abrogated in part on other grounds by Turrubiate v. State*, 399 S.W.3d 147 (Tex. Crim. App. 2013)). Prior to the issuance of a search warrant, a sworn affidavit must be filed by a peace officer setting forth sufficient facts to show probable cause

> that (1) a specific offense has been committed; (2) the specifically described property or items to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense; and (3) the property or items constituting such evidence are located at or on the particular person, place, or thing to be searched.

*State v. Dugas*, 296 S.W.3d 112, 116 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing TEX. CODE CRIM. PROC. ANN. art. 18.01(c)).

"In determining whether a warrant sufficiently establishes probable cause, [a] Court is bound by the four corners of the affidavit." *State v. Elrod*, 538 S.W.3d 551, 556 (Tex. Crim. App. 2017) (citing *Lagrone v. State*, 742 S.W.2d 659, 661 (Tex. Crim. App. 1987); *Lopez v. State*, 535 S.W.2d 643, 647 (Tex. Crim. App. 1976)). "[I]n interpreting affidavits for search warrants[,] courts must do so in a common sense and realistic manner." *Id.* (first alteration in original) (quoting *Lopez*, 535 S.W.2d at 647). "Whether the facts alleged in a probable cause affidavit sufficiently support a search warrant is determined by examining the totality of circumstances." *Ramos v. State*, 934 S.W.2d 358, 362–63 (Tex. Crim. App. 1996) (citing *Illinois v. Gates*, 462 U.S. 213, 228–29 (1983)). "The magistrate is permitted to draw reasonable

3

inferences from the facts and circumstances alleged." *Id.* at 363 (citing *Cassias v. State*, 719 S.W.2d 585, 587–88 (Tex. Crim. App. 1986)). An appellate court "should accord great deference to the magistrate's determination." *Id.* (citing *Bower v. State*, 769 S.W.2d 887, 902 (Tex. Crim. App. 1989), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991)). We review a trial court's denial of a motion to suppress under an abuse of discretion standard of review. *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999).

## A. The Search Warrant Affidavit Was Supported by Probable Cause

Ivory first argues that the search warrant affidavit, on its face, did not support the magistrate's finding of probable cause. We disagree.

The State charged Ivory with intoxication manslaughter. The elements of intoxication manslaughter are, in part, as follows: (1) the individual was intoxicated, (2) while operating a vehicle in a public place, and (3) because of his intoxication, he caused the death of another person. TEX. PENAL CODE ANN. § 49.08(a). Clearly, proof of Ivory's intoxication was an element of the charged offense, and consequently, the State was required to present sufficient evidence for the jury to find that Ivory was intoxicated. The Texas Penal Code defines "intoxicated," in relevant part, as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body." TEX. PENAL CODE ANN. § 49.01(2)(A). At trial, the State intended to prove Ivory's intoxication via his blood alcohol concentration (BAC).[1]

---

[1]Ivory's BAC was shown to have been 0.146 grams of alcohol per 100 milliliters of blood, well over the amount allowed by law. *See* TEX. PENAL CODE ANN. § 49.01(2)(B) (defining "intoxicated" as "having an alcohol concentration of 0.08 or more").

4

Before trial, Ivory filed a written motion to suppress his blood specimen, arguing that the evidence seized was obtained without a valid search warrant. After the jury was seated but before the trial on the merits had commenced, the trial court held a hearing, outside the presence of the jury, on Ivory's motion. Without objection, the State offered, and the trial court admitted, the search warrant affidavit prepared by responding officer Brandon Love, a copy of Love's body-camera recording, and Love's testimony. After hearing the testimony and reviewing the evidence, the trial court denied Ivory's motion.[2]

On appeal, Ivory maintains that the facts contained within the four corners of the search warrant affidavit did not provide a substantial basis upon which the magistrate could have reasonably concluded that a blood alcohol test would likely uncover evidence that Ivory had been driving while intoxicated. In his sworn affidavit, Trooper Love averred that after arriving at the scene of the wreck, Ivory admitted that he had been the driver of the wrecked vehicle. Love reported a strong odor of alcohol on Ivory; that Ivory's eyes were bloodshot, glassy, and watery; and that Ivory mumbled when he spoke, was confused, and was disorderly in appearance. When Love attempted to perform horizontal- and vertical-gaze nystagmus tests on Ivory, he was unable to follow Love's instructions. Love was unable to attempt any of the physical tests at the hospital, such as the heel-to-toe and balancing tests, because he was transferred to a bed on arrival. Although there was no liquor found in Ivory's vehicle, Ivory admitted to Love that he had been drinking, specifically, two shots of liquor and one or two beers about three hours prior to the wreck.

---

[2]Ivory also asked the trial court to suppress his statement that he had consumed alcohol prior to the wreck. The trial court denied that request.

5

In his brief, Ivory does not explain why he believes the factual bases in Love's search warrant affidavit were insufficient to justify the magistrate's issuance of the search warrant, nor does he direct the Court to any legal authority to support his contention. Yet, as the State points out, there are numerous cases that contain facts similar to those in this case and that support the magistrate's decision to issue a search warrant for blood evidence. *See Cotton v. State*, 686 S.W.2d 140, 142 (Tex. Crim. App. 1985) (evidence of intoxication may include bloodshot eyes, slurred speech, the odor of alcohol on a person's breath, unsteady balance, staggered gate); *Campos v. State*, 623 S.W.2d 657, 660 (Tex. Crim. App. [Panel Op.] 1981) (smell of beer on defendant and defendant's "thick-tongued" speech and unsteadiness on his feet sufficient to prove intoxication); *see also Luckenbach v. State*, 523 S.W.3d 849, 857–58 (Tex. App.—Houston (14th Dist.] 2017, pet. ref'd) (finding that driving wrong way on a one-way street, strong odor of alcohol on breath, glassy eyes, refusal to perform sobriety tests, and declined opportunity to provide sample of breath sufficient probable cause of driving while intoxicated (DWI)); *Hogan v. State*, 329 S.W.3d 90, 96 (Tex. App.—Fort Worth 2010, no pet.) (finding statements in affidavit that appellant "had a 'strong odor' of alcohol, 'bloodshot, watery[,] and heavy eyes,' a swayed and unsteady balance, and a staggered walk; and that he had refused to provide a breath specimen" sufficient probable cause of DWI (alteration in original)); *Foley v. State*, 327 S.W.3d 907, 912 (Tex. App.—Corpus Christi 2010, pet. ref'd) (concluding that following statements in affidavit, alone, were sufficient to establish probable cause: appellant was "geographically disoriented" and "smelled strongly of alcohol, had red and glassy eyes, slurred speech, poor balance, and . . . refused to provide a breath or blood sample"); *Kennedy v.*

6

*State*, 797 S.W.2d 695, 697 (Tex. App.—Houston [1st Dist.] 1990, no pet.) (finding proof of "red and glassy eyes, slurred speech, and strong odor of alcohol on his breath" sufficient to prove intoxication and to establish fair probability that evidence of commission of DWI could be found in blood).

Based on Love's observations at the scene and the contents of his search warrant affidavit—Ivory's bloodshot and watery eyes, failed nystagmus tests, odor of alcohol on his person, mumbled speech, confused state, disorderly appearance, and admission that he had been consuming alcohol prior to the wreck—the magistrate had a substantial basis for concluding that there was a fair probability or a substantial chance that evidence of Ivory's intoxication would be found in his blood.

### B.      Material Misrepresentations or Omissions

Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), Ivory complains that Love's search warrant affidavit contained material misrepresentations and omissions. Specifically, Ivory contends that Love's affidavit failed to include the fact that he had been involved in a major car wreck, which, according to Love, resulted in an injury to his eye and general disorientation. According to Ivory, that information would have explained the presence of his watery, bloodshot eyes, his failure to pass the nystagmus test, his disorderly appearance, and his mumbled speech.

In *Franks*, the United States Supreme Court determined that, if a probable cause affidavit included a false statement that was made knowingly, intentionally, or with reckless disregard for the truth and the statement was essential to establish probable cause, the warrant would be

7

rendered invalid pursuant to the Fourth Amendment. *Id.* at 155–56. Yet, pursuant to *Franks*, a defendant *must* make a request for a *Franks* hearing and then make a substantial preliminary showing that the affidavit supporting the complained-of warrant contained a false statement that was made "knowingly, intentionally, or with reckless disregard for the truth." *Harris v. State*, 227 S.W.3d 83, 85 (Tex. Crim. App. 2007).[3]

Ivory did not ask for a *Franks* hearing in regard to either the alleged misrepresentations or the alleged omissions.[4] Likewise, he did not make a substantial preliminary showing that Love's affidavit contained a false statement that Love made knowingly, intentionally, or with reckless disregard for the truth or that he intentionally omitted material information. Consequently, to the extent Ivory seeks reversal of the trial court's denial of his suppression motion based on *Franks*, his argument lacks merit.

We overrule Love's first point of error.

---

[3]In *Harris*, the Texas Court of Criminal Appeals explained that, in order for a defendant to be successful in a *Franks* hearing, he must (1) "[a]llege a deliberate falsehood or reckless disregard for the truth by the affiant, specifically pointing out the portions of the affidavit claimed to be false," (2) make "an offer of proof stating the supporting reasons," and (3) "[s]how that when the portion[s] of the affidavit alleged to be false" are removed "from the affidavit, the remaining content is insufficient to support the issuance of the warrant." *Harris*, 227 S.W.3d at 85. In this case, Ivory failed to meet his burden on either the alleged misrepresentations or the alleged omissions.

[4]Many courts have extended *Franks* to circumstances where an affiant deliberately or recklessly omitted a fact from his affidavit that would have eliminated probable cause. *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980) (recognizing that "allegations of material omissions were to be treated essentially similarly to claims of material misstatements" for purposes of *Franks*); *Gonzales v. State*, 481 S.W.3d 300, 311–12 (Tex. App.—San Antonio 2015, no pet.); *State v. Verde*, 432 S.W.3d 475, 486 (Tex. App.—Texarkana 2014, pet. ref'd) (recognizing that an omission can deceive in certain instances); *Blake v. State*, 125 S.W.3d 717, 724 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Heitman v. State*, 789 S.W.2d 607, 610–11 (Tex. App.—Dallas 1990, pet. ref'd).

For purposes of this opinion, we will consider that a claim of material omission is treated essentially the same as a claim of material misrepresentation. *See Martin*, 615 F.2d at 328.

## II.     The Evidence Was Sufficient to Support the Jury's Guilty Verdict

In his second point of error, Ivory contends that the State failed to present legally sufficient evidence to prove beyond a reasonable doubt that he was guilty of intoxication manslaughter.  Specifically, Ivory argues that the State failed to show (1) that he was intoxicated at the time of the crash or (2) that his intoxication caused the crash.

### A.     Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt."  *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)).  "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented."  *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)).  "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common

9

design to do the prohibited act.'" *Williamson*, 589 S.W.3d at 297 (quoting *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018), (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

**B.      Discussion**

Here, under the statute and the indictment, to convict Ivory of intoxication manslaughter, the State was required to prove beyond a reasonable doubt that, on or about May 19, 2020,

10

(1) Ivory operated a motor vehicle in a public place (2) while intoxicated by alcohol and, (3) by reason of such intoxication, (4) caused Marva Jewel Godbolt's death (5) by accident or mistake. *See* TEX. PENAL CODE ANN. § 49.08(a).

### 1. Evidence

On May 19, 2020, at around 4:30 p.m., Texas Department of Public Safety Trooper Love was dispatched to farm-to-market road (FM) 557 in Camp County in response to Ivory's single-vehicle crash.[5] Love arrived at the scene at approximately 5:00 p.m. According to Love, it was "a really pretty day to be out." There had been no rain and only mild winds. Love was responsible for determining what caused the crash, so he began securing evidence and talking to witnesses. Love said that he briefly met Ivory, whom he knew to be the driver of the vehicle. According to Love, Ivory already had been placed in an ambulance, and the emergency personnel were preparing him for transport to the hospital. Love said that he could smell the odor of alcohol when he entered the ambulance and that one of the paramedics "g[a]ve [him] a signal that . . . [Ivory] had been drinking or was -- had alcohol involved." Love was also aware that the other occupant in the vehicle, Godbolt, had been killed.

At the crash scene, Love observed "skid marks coming from the grass on the right side of the roadway all the way across the roadway, and [he] determined that it was a curve in the roadway." Love said that he had investigated enough crashes[6] to know that Ivory's vehicle had been traveling in an eastward direction, and when the vehicle was going around the curve, it "got

---

[5]A Camp County sheriff's deputy was already at the scene when Love arrived.

[6]Love testified that he had participated in extensive training in crash reconstruction and that he had "worked" over a thousand wrecks during his career.

11

off the road slightly, and overcorrected to the left and side-skidded into the creek there and struck a tree." Love explained that the passenger side of the vehicle took the entire impact and that "the impact was directly where Mrs. Godbolt was sitting." According to Love, the vehicle landed on its right side and uprooted the tree.

After Love secured the scene, he realized that a potential crime may have occurred. Love left the scene and proceeded to the hospital to speak with Ivory. Love said that Ivory was acting confused. For instance, Ivory asked "how Marva was doing[,] or him and Marva were arguing, and then a few minutes later, he would not even know he had a passenger in his vehicle." Explaining that Love was unsure about where he had been or where he was going, Love said, "[Ivory's] statements just didn't make any sense at all."

In addition, both Ivory and Love were wearing masks that day. Love said that, even though Ivory was wearing a mask, he could smell the odor of alcohol coming from his breath. Ivory admitted to Love that he had been the driver of the vehicle and that, prior to driving, he had consumed two shots of liquor and two or three beers. According to Love, Ivory did not consume any alcohol after the crash occurred. Believing that Ivory had been intoxicated, Love asked him if he would voluntarily give a sample of his blood. Ivory refused to do so at 6:20 p.m. Love then began the process of getting a search warrant for Ivory's blood. Having secured the warrant, Love presented it to the laboratory technician, who proceeded to take a sample of Ivory's blood around 7:15 p.m., almost three hours after the wreck occurred.

After completing his investigation, Love determined that Ivory was driving at an unsafe speed, that he failed to drive in a single lane, and that he was distracted and inattentive. Love

12

attributed all of those inadequacies to Ivory being under the influence of alcohol at the time he was driving. In addition, Love's crash report stated,[7]

> Unit 1 was traveling east on FM 557. The driver of Unit 1 was intoxicated/under the influence of alcohol. The driver of Unit 1 stated that he was speeding over the limit, was traveling too fast for the curve in the roadway and was arguing with his passenger in the vehicle because she was telling him to slow down. As Unit 1 began to travel through a left[-]hand curve in the roadway, both of Unit 1's right side tires went off the pavement and into the loose gravel near the edge of the pavement. Unit 1 began to side skid counter clockwise [sic,] as the driver of Unit 1 steered Unit I sharply to the left. Unit 1 skidded across both lanes of the roadway and side skidded into the north side barrow ditch. Unit 1 then struck a large tree with the right passenger side of Unit 1, causing fatal injuries to the passenger in Unit I. Unit 1 then rolled onto its right side and came to rest on its right side facing northwest.

Love opined that Ivory's intoxication was the chief contributing factor of the crash and that the crash caused Godbolt's death.

On cross-examination, Love admitted that he had never met Ivory before the accident. He also conceded that he was not familiar with Ivory's manner of speaking.

Fredrick Taylor testified that, while driving down FM 557 at around 3:30 or 4:00 p.m., he saw a man waving his arms in the road, indicating that there had been a wreck. About the same time, a deputy sheriff arrived at the scene. Taylor said that he heard screaming coming from a man, later determined to be Ivory, who was hanging out the windshield of the vehicle. Emergency medical services (EMS) and fire department personnel arrived at the scene not long after Taylor's arrival. Taylor stated that he did not get a "good look" at Ivory and that he did not see the wreck occur.

---

[7]Love's testimony was consistent with his crash report.

13

Gladewater firefighter Jakob Rosewell was dispatched to FM 557 after being advised that there was a "single motor vehicle accident, with a partial ejection." When he arrived at the scene, he saw a Lincoln Town Car in the westbound lane that was flipped over, partly in the ditch and partly on the culvert. Rosewell saw that Ivory was "partially ejected through the passenger side, bottom of the windshield." Rosewell stated, "And then once the -- we flipped the car over, you could see . . . the passenger side door was caved in." According to Rosewell, the driver's side of the vehicle did not have a lot of damage. When Rosewell initially made contact with Ivory, he was complaining about having glass in his eyes. Rosewell said that, when he asked Ivory questions, he "remember[ed] the distinct smell of alcohol." Rosewell explained that it was only after they removed Ivory that they realized Godbolt was in the passenger seat of the vehicle. Rosewell said, "At that point, [Godbolt] was showing no vital signs, no signs of life."

Gary Schutter, a paramedic with LifeNet EMS, was also dispatched to the scene. Upon his arrival, Schutter made contact with Ivory, who he said was the driver of the wrecked vehicle. He explained, "I saw this gentleman half in, half out of the vehicle. It was up towards -- was hanging out the front windshield." Schutter said that Ivory was able to tell him his name, where he was, and "what was going on." When Schutter asked Ivory if he was hurt, Ivory told him that he had some glass in his eyes. Ivory also told Schutter that he had been drinking and that he could not remember if he had taken any medication prior to driving. Ivory told Schutter that he had consumed "three 16-ounce beers and had a good drink of whiskey." When Schutter asked Ivory if he believed the drinking contributed to the accident, Ivory "said that he felt like he probably was driving too fast." Schutter and his partner put a cervical collar on Ivory and placed

14

him on a "spine board" prior to moving him to the ambulance. Schutter would not speculate as to whether Ivory went through the windshield head-first. According to Schutter, Ivory was confused as to whether there had been a passenger in the car with him. But Schutter could not say whether his confusion was caused by his injuries or from drinking alcohol.

Daniel Perez, an emergency medical technician with Camp County, testified that, when he arrived at the scene, he observed a conscious person "hanging part of the -- maybe waist up, protruding from the windshield." According to Perez, the person, later identified as Ivory, had several injuries to his face. Perez said, "I smelled some alcohol when -- in his breath when he talked to us, because we were very close to him." Perez said that Ivory admitted that he had been drinking alcohol, but Perez was unable to remember whether Ivory told him the amount of alcohol he had consumed. After seeing that another person was in the vehicle, Perez checked for a pulse but was unable to find one.

Retired Camp County Justice of the Peace Bobby Carpenter[8] responded to the scene of the wreck and eventually completed an inquest investigation form, which would be used to prepare Godbolt's death certificate. In his notes, Carpenter wrote that "there were signs of alcohol involved," but he did not "recall where [he] got that evidence." Carpenter explained, "It must have come from someone that I talked to there at the scene, because I do not recall witnessing that myself." According to Carpenter, by the time he reached the scene, Ivory had been transported to the hospital.

---

[8]Carpenter relieved the sitting justice of the peace a couple of weekends a month.

15

Karen Shumate, a chemist with the Texas Department of Public Safety Crime Laboratory in Tyler, explained to the jury the steps used to determine the amount of alcohol in a person's blood. Over Ivory's objection, the trial court admitted the results of Ivory's blood sample, which was "0.146 grams of alcohol per 100 milliliters of blood." Shumate agreed that the legal limit was .08 grams of alcohol per 100 milliliters of blood. Shumate explained that an average person of normal health and normal liver function eliminates about 0.2 grams of alcohol per hour. Shumate was asked, "So if a blood draw was at 7:15 p.m. and if we knew that a person did not consume any alcohol after 4:30 p.m., do you believe that that concentration at 4:30 p.m. would have been higher than when the blood was drawn at 7:15 p.m.?"[9] Shumate stated that it would most likely have been higher at the earlier time.

Sixty-nine-year-old Ivory testified that he suffered from chronic back pain and that instead of taking prescription medication, he turned to alcohol to relieve his pain. Ivory had known Godbolt for several years, and they were living together in the same household, along with Godbolt's mother. According to Ivory, over the years, Godbolt's mental and physical health had deteriorated, and her behavior became erratic. When Godbolt's physical condition worsened, Ivory began driving her car for her.

The day of the wreck, Ivory and Godbolt went to town to eat breakfast. When they returned home, Ivory started planting sweet potatoes in his garden. Ivory explained that, while he was working, he drank two beers and two liquor drinks, "not at the same time, just in different periods of time." Ivory said that he drank his first beer around 10:00 a.m. and that he began

---

[9]The record shows that the wreck occurred at 4:30 p.m. on May 19, 2020, and Ivory's blood was drawn at 7:15 p.m. that same day.

16

drinking liquor at around 11:30 a.m. Ivory claimed that he did not drink "to get drunk," only to dull his back pain. At some point., Ivory got an offer to cut down some trees, so Ivory and Godbolt went to town to buy a chainsaw. After buying the chainsaw, the pair stopped by Ivory's brother's home. According to Ivory, after stopping by his brother's house, he was in a hurry to get to his job. Godbolt told Ivory that he was driving too fast and that he needed to pull over so that she could drive. Ivory said that, when he refused to stop the car, Godbolt got angry and grabbed the steering wheel, causing the vehicle to leave the road. While attempting to correct, Ivory lost control. According to Ivory, the crash caused him to lose consciousness. Ivory said that he did not recall being taken to the hospital.

### 2. The State Proved Beyond a Reasonable Doubt that Ivory Was Intoxicated at the Time of the Crash

First, Ivory contends that the jury's guilty verdict was not rational given the lack of sufficient evidence to prove that Ivory was intoxicated at the time of the crash. Specifically, Ivory argues that the post-driving behavior that the State relied upon to prove intoxication was more appropriately attributed to the fact that Ivory had just been involved in a serious car crash that resulted in his partial ejection through the windshield. According to Ivory, "Apart from the blood alcohol test result, there is precious little to support an inference that Ivory was intoxicated at the time of the crash." We disagree.

There are two alternate ways that an individual can be considered "intoxicated": (1) he does not have "the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body," TEX. PENAL CODE ANN. § 49.01(2)(A), or

17

(2) he has an "alcohol concentration of 0.08 or more," TEX. PENAL CODE ANN. § 49.01(2)(B). In addition to Ivory's blood test results clearly showing that his blood alcohol concentration was well over the legal limit—even three hours after the wreck—the jury was also allowed to consider Trooper Love's report that Ivory was confused, mumbled, could not recall whether he had a passenger with him, failed the nystagmus test, and could not follow instructions. Likewise, the jury heard from multiple witnesses that they smelled the odor of alcohol on Ivory when conversing with him or while being in close proximity to him. Moreover, Ivory refused to submit a blood sample. The refusal to take a blood alcohol test is relevant as evidence of intoxication. *See Griffith v. State*, 55 S.W.3d 598, 601 (Tex. Crim. App. 2001); *see also* TEX. TRANSP. CODE ANN. § 724.015(a)(1) ("if the person refuses to submit to the taking of the specimen, that refusal may be admissible in a subsequent prosecution"). Lastly, Ivory admitted that he had been drinking beer and alcoholic beverages prior to driving that day.

Yet, Ivory contends that the physical inadequacies he displayed after the wreck were "more appropriately attributed" to the wreck. Ivory's argument ignores the remaining evidence, including that his blood alcohol concentration was 0.146 long after the wreck occurred.[10] That, along with the other testimony regarding Ivory's physical impairments, would be enough to prove that Ivory was intoxicated at the time of the wreck. As the sole judge of the weight and credibility of the evidence, the jury had the burden of determining what it believed. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Based on the evidence presented, the jury had

---

[10]There is no evidence that Ivory consumed alcohol after the wreck.

18

the discretion to conclude that Ivory's physical impairments were the result of his consumption of alcohol.

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that a rational jury could have found, beyond a reasonable doubt, that Ivory was intoxicated at the time of the wreck.

### 3. The State Proved Beyond a Reasonable Doubt that Ivory's Intoxication Caused the Crash that Resulted in Godbolt's Death

Next, Ivory argues that the State failed to prove that his intoxication caused the crash. Instead, according to Ivory, "[t]here were other intervening factors that caused or contributed to the collision, namely, Ivory's argument with Godbolt immediately prior to the crash and the fact that Ivory was driving fast trying to get to a job."

"The existence or nonexistence of a causal connection is normally a question for the jury's determination." *Oladle v. State*, 635 S.W.3d 404, 408 (Tex. App.—San Antonio 2021, no pet.) (quoting *Martin v. State*, No. 04-13-00483-CR, 2014 WL 2802912, at *1 (Tex. App.—San Antonio Jun. 18, 2014, no pet.) (mem. op., not designated for publication) (citing *Hale v. State*, 194 S.W.3d 39, 42 (Tex. App.—Texarkana 2006, no pet.))). "Pursuant to the Texas Penal Code, 'a person is criminally responsible if the result would not have occurred but for [that person's] conduct, operating either alone *or concurrently with another cause*, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor [was] clearly insufficient." *Id.* (quoting TEX. PENAL CODE ANN. § 6.04(a)). "In other words, if a concurrent cause is present, 'two possible combinations exist to satisfy the 'but for' requirement: (1) the defendant's conduct may be sufficient by itself to have caused the harm, regardless of the

19

existence of a concurrent cause; or (2) the defendant's conduct and the other cause *together* may be sufficient to have caused the harm.'" *Id.* (quoting *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986)). Yet, "[i]f the additional cause, other than the defendant's conduct, is clearly sufficient, by itself, to produce the result *and* the defendant's conduct, by itself, is clearly insufficient, then the defendant cannot be convicted." *Id.* (alteration in original) (quoting *Robbins*, 717 S.W.2d at 351; *Walter v. State*, 581 S.W.3d 957, 971 (Tex. App.—Eastland 2019, pet. ref'd)).

Here, based on the evidence presented by the State, a reasonable fact-finder could have found beyond a reasonable doubt that Ivory operated a motor vehicle on a public street while intoxicated. As we have already stated, Ivory's blood alcohol concentration was well over the legal limit hours after the wreck occurred. There was also evidence that Ivory was disoriented, smelled of alcohol, failed the nystagmus test, and had mumbled speech. Ivory admitted that he drank alcohol prior to the wreck and that he drank alcohol on a regular basis to relieve his chronic back pain. In addition to those signs of intoxication, Ivory told Love at the scene that he believed he had been driving too fast at the time of the wreck.

Viewing the evidence in the light most favorable to the judgment, we find that there was sufficient evidence for a jury to have found beyond a reasonable doubt that, at a minimum, Ivory's intoxication alone was sufficient to cause Godbolt's death, or that Ivory's conduct coupled with Godbolt's conduct caused Godbolt's death. In either event, the State produced sufficient causal evidence to support Ivory's conviction for intoxication manslaughter.

We overrule Ivory's second point of error.

20

### III. The Assessment of a $100.00 "EMS fee" Was Error

In his third point of error, Ivory contends that the trial court erred when it assessed an "Emergency Management Services" (EMS) fee. Specifically, Ivory maintains (1) that the statute allowing for the assessment of an EMS fee is facially unconstitutional and (2) that the trial court erred when it failed to assess a $100.00 fine in lieu of the improperly assessed EMS fee, thereby rendering its judgment against Ivory void.

#### A. The EMS Fee Is Facially Unconstitutional

A judgment of conviction is required to order a defendant to pay costs. *Johnson v. State*, 423 S.W.3d 385, 389 (Tex. Crim. App. 2014) (citing TEX. CODE CRIM. PROC. ANN. art. 42.15–.16). Even so, "[o]nly statutorily authorized court costs may be assessed against a criminal defendant." *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 103.002). "Neither the statute authorizing the collection of emergency-services cost nor its attendant statutes direct the funds to be used for a legitimate, criminal-justice purpose; therefore, it is a tax that is facially unconstitutional." *Casas v. State*, 524 S.W.3d 921, 927 (Tex. App.—Fort Worth 2017, no pet.); *see Robison v. State*, No. 06-17-00082-CR, 2017 WL 4655107, at *4 (Tex. App.—Texarkana Oct. 18, 2017, pet. ref'd) (mem. op., not designated for publication).[11]

Because the assessment of the EMS fee has been declared facially unconstitutional, we agree with Ivory that it must be deleted from the clerk's bill of costs.

---

[11]"Although unpublished opinions have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

### B.     Ivory's Conviction Is Not Void

Effective January 1, 2020, the Texas Legislature amended Article 102.0185 of the Texas Code of Criminal Procedure, entitled "Fine for Intoxication Convictions:  Emergency Medical Services, Trauma Facilities, and Trauma Care Systems."  Pursuant to the statute, upon a conviction of an offense under Chapter 49 of the Texas Penal Code, except for Sections 49.02 and 49.031, the defendant "shall" pay a $100.00 fine.  TEX. CODE CRIM. PROC. ANN. art. 102.0185 (Supp.).  Prior to that amendment, Article 102.0185 was entitled "Additional Costs Attendant to Intoxication Convictions:  Emergency Medical Services, Trauma Facilities, and Trauma Care Systems."  *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 2.38, 2019 Tex. Gen. Laws 3981, 4005.  The 2020 amendment substituted "fine" for "costs" throughout the statute and applies only to an offense committed on or after the effective date, which was January 1, 2020.  The previous law applied to offenses committed before January 1, 2020.  *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 2.38, 2019 Tex. Gen. Laws 3981, 4035.  In this case, the State alleged that Ivory committed intoxication manslaughter on or about May 19, 2020.

Ivory maintains that the trial court's failure to impose the new mandatory fine rendered its judgment of conviction void because Ivory's sentence fell below the statutory range of punishment.  According to the State, Ivory benefitted from the trial court's failure to assess the mandatory fine and, thus, he is estopped from challenging the judgment.

"[A] defendant has an absolute and nonwaivable right to be sentenced within the proper range of punishment established by the legislature."  *Speth v. State*, 6 S.W.3d 530, 532–33 (Tex.

22

Crim. App. 1999). "According to the Texas Court of Criminal Appeals, a defendant cannot waive certain statutorily mandated requirements such as statutorily mandated sentences, but under the doctrine of invited error (i.e., estoppel), he cannot also complain later about an action that he requested." *Ex parte Shoe*, 137 S.W.3d 100, 102 (Tex. App.—Fort Worth 2004, pet. denied)[12] (per curiam) (citing *Prystash v. State*, 3 S.W.3d 522, 530–32 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000).

"Estoppel by judgment is a form of estoppel whereby a person 'who accepts the benefits of a judgment, decree, or judicial order is estopped from denying the validity or propriety thereof, or of any part thereof, on any grounds; nor can he or she reject its burdensome consequences.'" *Deen v. State*, 509 S.W.3d 345, 349 (Tex. Crim. App. 2017) (quoting *Rhodes v. State*, 240 S.W.3d 882, 891 (Tex. Crim. App. 2007); 31 C.J.S. *Estoppel & Waiver* § 172 (2008)). "To be estopped by a judgment, a person must accept the benefits of the judgment voluntarily." *Id.* (citing *Gutierrez v. State*, 380 S.W.3d 167, 178 (Tex. Crim. App. 2012)). In *Rhodes*, the Texas Court of Criminal Appeals stated that "a defendant who has enjoyed the benefits of an agreed judgment prescribing a too-lenient punishment should not be permitted to collaterally attack that judgment on a later date on the basis of the illegal leniency." *Id.* at 349 (quoting *Rhodes*, 240 S.W.3d at 892).

---

[12]Pursuant to a plea agreement, Shoe was convicted of DWI in 1997. *Ex parte Shoe*, 137 S.W.3d at 101. The trial court sentenced Shoe to forty days' confinement in jail, but it failed to impose a mandatory minimum fine. *Id.* Five years later, Shoe filed a petition for a writ of habeas corpus, arguing that his 1997 DWI conviction was void because his sentence fell below the minimum statutory requirement. *Id.* The trial court denied Shoe's application. The Fort Worth Court of Appeals affirmed, finding that Shoe was estopped from challenging the 1997 conviction because he had accepted the benefit of the lesser sentence when he entered into the plea-bargain agreement and benefited by not having to pay the fine. *Id.* at 101–02.

"Although *Rhodes* addressed estoppel by judgment in the context of a hypothetical plea agreement, and therefore spoke in terms of accepting the benefits of an 'agreed' judgment, [the Court of Criminal Appeals has] since made it clear that the focus of estoppel by judgment is the *acceptance of a benefit* rather than an agreement contemporaneous with a judgment." *Id.* (emphasis added).

That rule applies in this case. Consequently, because Ivory accepted the benefit of the trial court's failure to assess the $100.00 fine—which amounts to a lighter sentence—he cannot now complain about that advantage on appeal.

Having sustained Ivory's third point of error, we modify the bill of costs by deleting the $100.00 EMS fee from the total assessed costs.

## IV. The Assessment of Peace Officer Service Fees Was Not Error[13]

### A. Ivory's Constitutional Rights Were Not Violated When the Trial Court Assessed Officer Service Fees Against Him

In his fourth point of error, Ivory challenges the trial court's assessment of $195.00 for "peace officer service fees" (service fee), which covers the costs of summoning the State's witnesses. According to Ivory, Article 102.011 of the Texas Code of Criminal Procedure is unconstitutional as applied to him because the statute violates (1) the Compulsory Process Clause and (2) the Confrontation Clause. We disagree.

"A litigant raising only an 'as applied' challenge concedes the general constitutionality of the statute, but asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011) (orig.

---

[13]However, as explained below, the fee must be modified to reflect the correct amount.

24

proceeding). In other words, a defendant must show that the challenged statute is unconstitutional as applied to him. *Id.* "That the statute may be, in its operation, unconstitutional as to others is not sufficient." *Vuong v. State*, 830 S.W.2d 929, 941 (Tex. Crim. App. 1992) (citing *Parent v. State*, 621 S.W.2d 796, 797 (Tex. Crim. App. [Panel Op.] 1981)).

Article 102.011 provides, in relevant part:

> (a) A defendant convicted of a felony or a misdemeanor shall pay the following reimbursement fees to defray the cost of the services provided in the case by a peace officer:
>
> . . . .
>
> (3) $5 for summoning a witness . . . .

TEX. CODE CRIM. PROC. ANN. art. 102.011(a)(3) (Supp.).

First, Ivory argues that, because he is indigent, requiring him to pay for witnesses at his trial violates his constitutional right to compulsory process.[14]

The Compulsory Process Clause ensures "the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). Yet, that right is restricted to "compulsory process for obtaining witnesses whose testimony would be both material and favorable to the defense." *Coleman v. State*, 966 S.W.2d 525, 527–28 (Tex. Crim. App. 1998). It is the defendant's burden to make a preliminary showing of the "materiality and favorableness" of any witness he seeks to present at trial. *Id.* at 528.

---

[14]Ivory was found to be indigent before trial, and he is "presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." *London v. State*, 490 S.W.3d 503, 509 (Tex. Crim. App. 2016) (quoting TEX. CODE CRIM. PROC. ANN. art. 26.04). The State does not argue on appeal that a material change in Ivory's financial circumstances has occurred.

25

In this case, Ivory has wholly failed to identify at trial, or on appeal, a material and favorable witness that he wished to present at trial. Moreover, there is no evidence in the record to show that he attempted to issue a subpoena or compel process of any witness. Absent a showing that a material and favorable witness was available to be called by Ivory, we are unable to conclude that, as applied to Ivory, the $5.00 witness fee denied his right to compulsory process.

Next, Ivory contends that the assessment of officer service fees violated his right to confront witnesses against him. Under the Sixth Amendment, "the accused shall enjoy the right to . . . be confronted with the witnesses against him" "[i]n all criminal prosecutions." U.S. CONST. amend. VI. "The Sixth Amendment's right of confrontation is a fundamental right and is applicable to the States by virtue of the Fourteenth Amendment." *Moore v. State*, 169 S.W.3d 467, 470 (Tex. App.—Texarkana 2005, pet. ref'd) (quoting *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991)). "The Confrontation Clause 'provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.'" *London v. State*, 526 S.W.3d 596, 600 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Ritchie*, 480 U.S. 51, 107 S.Ct. at 998; *see also* TEX. CONST. art. I, § 10).

It is well established that, to present an issue to this Court, a party's brief shall, among other things, "state concisely and without argument the facts pertinent to the issues or points presented." TEX. R. APP. P. 38.1(g). "The statement [of facts] must be supported by record references," TEX. R. APP. P. 38.1(g), and "[t]he brief must contain a clear and concise argument

for the contentions made, with appropriate citations to authorities and to the record," TEX. R. APP. P. 38.1(i). As a result, "[b]are assertions of error, without argument or authority, waive error." *Washington v. Bank of New York*, 362 S.W.3d 853, 854 (Tex. App.—Dallas 2012, no pet.). "When a party fails to adequately brief a complaint, he waives the issue on appeal." *Id.* at 854–55.

Despite his contention, Ivory fails to provide any argument as to how the service fees denied his right to confront witnesses against him. To the extent Ivory maintains that the trial court's assessment of officer service fees violated the Confrontation Clause, he has waived that issue on appeal.

**B.      The Assessed Officer Service Fees Were Not Supported by the Record**

Ivory also argues that, even assuming Article 102.011 is constitutional, the record does not support the assessment of $195.00 in officer service fees. The record shows that the clerk's bill of costs assessed $195.00 in service fees for summoning thirty-nine of the State's witnesses. Ivory contends that the assessment is incorrect because the State filed only twenty subpoena applications, of which only seventeen were actually executed by the sheriff's office. According to Ivory, the record supports the imposition of service fees in the amount of $85.00 (seventeen witnesses at $5.00 per witness). As a result, Ivory asks this Court to modify the clerk's bill of costs to reflect an assessment of $85.00 in officer service fees.

The State maintains that it prepared and filed fifty subpoena applications and that the sheriff's office executed nineteen subpoenas. According to the State, Ivory should have been

27

assessed $250.00 in officer service fees ($50.00 x 5), not $195.00. Thus, according to the State, Ivory's complaint has no merit and should be overruled.[15]

In *Ramirez v. State*, 410 S.W.3d 359 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd), the Houston Court of Appeals held that Article 102.011 permits the assessment of the $5.00 service fee per witness, each time a *witness is served a summons. Id.* at 365–66. The court explained, "The intent of the statute is to reimburse the costs borne by the peace officer. This goal would not be achieved by allowing only one payment for summoning a witness regardless of the number of times that witness would have to be summoned. Accordingly, we construe the statute to require a $5 fee for each witness summoned each time the witness is summoned." *Id.*

Contrary to the State's contention, the $5.00 service fee is assessed each time a witness is served a summons. *See id.* In this case, the record contains seventeen returns of service, indicating that only seventeen potential witnesses were actually served.

As a result, we must modify the clerk's bill of costs by amending the assessed $195.00 in officer service fees to reflect an assessment of $85.00.

## V. The Assessment of Attorney Fees Was Error

In his fifth point of error, Ivory complains about the trial court's assessment of attorney fees in the amount of $400.00. We agree that the assessment of attorney fees in this case was error.

---

[15]It does not appear that the State seeks an increase in the fees assessed. In *O'Bannon v. State*, 435 S.W.3d 378, 380 (Tex. App.—Houston [14th Dist.] 2014, no pet.), the appellate court refused to disturb a witness fee of $110.00, even though the record supported a greater fee of $165.00 because eleven witnesses were summoned three times.

Under Article 26.05(g) of the Texas Code of Criminal Procedure, a trial court has the authority to order the reimbursement of a court-appointed attorney's fees only if "the judge determines that a defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided . . . including any expenses and costs." TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (Supp.). "[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees" of legal services provided. *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011) (alteration in original) (quoting *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)).

Here, due to Ivory's indigency, he received a court-appointed attorney, and throughout this case, Ivory has remained incarcerated and indigent. The record lacks any indication that his financial status or ability to pay changed at any point in the case. *See Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013); *Martin*, 405 S.W.3d at 946–47. Even so, the judgment reflects that Ivory was assessed $400.00 in attorney fees. We "have the authority to reform judgments and affirm as modified in cases where there is nonreversible error." *Sharpe v. State*, 607 S.W.3d 446, 448 (Tex. App.—Texarkana 2020, no pet.) (quoting *Ferguson v. State*, 435 S.W.3d 291, 293 (Tex. App.—Waco 2014, pet. struck), *overruled on other grounds by Cummins v. State*, 646 S.W.3d 605 (Tex. App.—Waco 2022, pet. ref'd).

Sustaining Ivory's fifth point of error, we modify the clerk's bill of costs by deleting the assessment of $400.00 for attorney fees.

## VI.   The Assessment of a Time Payment Fee Was Error

In his last point of error, Ivory contends that the trial court erred when it assessed a time payment fee in the amount of $15.00. The State concedes this point.

The Texas Court of Criminal Appeals recently concluded that a time payment fee like the one imposed here "must indeed be struck for being prematurely assessed because a defendant's appeal suspends the duty to pay court costs and therefore suspends the running of the clock for the purposes of the time payment fee." *Dulin v. State*, 620 S.W.3d 129, 129 (Tex. Crim. App. 2021). "As a consequence, even now, assessment of the time payment fee in this case would be premature because appellate proceedings are still pending." *Id.* Pursuant to *Dulin*, we strike the time payment fee "in [its] entirety, without prejudice to [it] being assessed later if, more than 30 days after the issuance of the appellate mandate, the defendant has failed to completely pay any fine, court costs, or restitution" owed. *Id.* at 133.

Sustaining Ivory's sixth point of error, we modify the clerk's bill of costs by deleting the time payment fee in the amount of $15.00.

## III.   Conclusion

The bill of costs in this case contained $1,025.00 in court costs, service fees, and reimbursement fees, which included, in part, (1) a $100.00 EMS fee, (2) a $15.00 time payment fee, (3) attorney fees in the amount of $400.00, and (4) $195.00 in peace officer service fees for summoning witnesses. We modify the clerk's certified bill of costs by deleting the $100.00 EMS fee, the $400.00 in attorney fees, and the $15.00 time payment fee and by amending the assessed $195.00 in officer service fees to reflect the assessment of $85.00.

We affirm the trial court's judgment.[16]

Scott E. Stevens
Chief Justice

Date Submitted:     November 14, 2022
Date Decided:       January 6, 2023

Do Not Publish

---

[16]The trial court did not include the assessed costs in its judgment of conviction. "Court costs listed in a certified bill of costs need neither be orally pronounced nor incorporated by reference in the judgment to be effective." *Johnson*, 423 S.W.3d at 389 (citing *Armstrong*, 340 S.W.3d at 766–67).